[672 NYS2d 8]

Joel Wiener et al., Appellants, v Lazard Freres & Co. et al., Respondents, et al., Defendants.

First Department, April 16, 1998

**APPEARANCES OF COUNSEL**

*Philip H. Kalban* of counsel *(Barbara Hair* on the brief; *Fischbein Badillo Wagner Harding,* attorneys), for appellants.

*Jay Harris Rabin* of counsel *(Matthew Gluck* and *Guy Yonay* on the brief; *Fried, Frank, Harris, Shriver & Jacobson,* attorneys), for Lazard Freres & Co. and others, respondents.

*John H. Duchelle* of counsel *(Wallace A. Christensen* and *John R. Gerstein* on the brief; *Ross, Dixon & Masback, L. L. P.,* attorneys), for Zapco 1500 Investment, L.P., respondent.

**OPINION OF THE COURT**

MILONAS, J. P.

At issue in this action is the nature of the relationship be-

tween plaintiffs and the Lazard defendants (hereinafter collectively referred to as Lazard) in the context of plaintiffs' efforts to repurchase from the mortgagee bank a building on whose mortgage plaintiffs had defaulted. Plaintiffs are partners of 1500 Realty, which owned an office building at 1500 Broadway. In the spring of 1994, the partnership defaulted on the building's mortgage held by Crossland Federal Savings Bank and filed for bankruptcy pursuant to chapter 11 of the Bankruptcy Code (11 USC). In April 1995, plaintiffs and Crossland entered into an agreement by which Crossland would release plaintiffs from the limited personal guaranty executed in connection with the mortgage in exchange for certain payments as well as plaintiffs' cooperation in transferring the property to the bank. Two months later, a reorganization plan was approved in the bankruptcy proceeding, whereby the property was to be transferred to Crossland or its designee.

However, both prior to and after defaulting on the mortgage, plaintiffs were engaged in an effort to raise sufficient funds to enable them to settle with Crossland and retain ownership of the building. Their intent was to secure Crossland's consent to a transfer of the building to a new entity under plaintiffs' ownership and control, free and clear of the original $75 million mortgage, for a price in the $40 million to $60 million range. To this end, plaintiffs made preliminary arrangements with Credit Lyonnais for a first mortgage in the amount of up to $30 million; they then initiated contact with Lazard to secure a second mortgage for the balance of the purchase price. By letter dated December 22, 1993, Lazard proposed extending an interim first mortgage loan in the amount of $50 million to $55 million, to be replaced within a year by financing from an outside lender in the $35 million to $50 million range, with Lazard retaining a subordinated mortgage of $15 million to $17 million.

Plaintiffs decided to proceed with Lazard's proposal and to work with Lazard in dealing with Crossland. Plaintiffs and Lazard executed a commitment letter dated September 16, 1994, pursuant to which Lazard, as lender, agreed to provide $45 million as interim financing for the purchase or refinancing of the Crossland mortgage, in return for a $300,000 application fee. Lazard was given the exclusive right to provide the financing during an "exclusive period," as defined in the letter, unless it elected earlier not to proceed with the loan.

In connection with Lazard's due diligence under this commitment letter, plaintiffs were to provide Lazard with information

regarding the financial history, physical condition and all other relevant data in their possession as owners of the property. Plaintiffs considered this information highly confidential and refused to disclose it until after a formal agreement was executed. It was, and remains, plaintiffs' contention that, as owner of the property, their detailed knowledge of every aspect of the building's operation—from the specifics of its construction and safety-related conditions to negotiations with tenants and labor unions—placed them in a uniquely advantageous position in terms of making the best (i.e., the highest) offer to Crossland. Once the commitment letter was executed, plaintiffs provided this information to Lazard, which reviewed it and arranged for the necessary financial and environmental audits of the property.

By letter dated November 16, 1994, Lazard indicated that it was prepared to go ahead with the interim financing described and asked plaintiffs to sign an "agreement to proceed" under which they would pay a $400,000 deposit by December 1, 1994. This agreement was never signed, however, because Crossland would not agree to a transaction at the price specified in the commitment letter; Crossland also insisted that any agreement be made within the context of the then-pending bankruptcy proceeding, whereby Crossland would become the owner. At this point, according to plaintiffs, the parties agreed that Anthony Meyer, a Lazard executive, would take over the negotiations with Crossland on behalf of plaintiffs, while the latter would attempt to finalize a reorganization plan and resolve their obligations under the personal guaranty executed in conjunction with the Crossland mortgage.

Thus, according to plaintiffs, as of December 1994 through August 1995, they believed that Lazard was actively negotiating with Crossland on their behalf to effect the purchase of the property, with the financing to be provided by a Lazard affiliate and/or Credit Lyonnais. Pursuant to their understanding to this effect, plaintiffs went ahead and reached an agreement with Crossland on the reorganization plan, by which 1500 Realty would transfer the property to Crossland or its designee in exchange for the settlement of plaintiffs' personal guaranty.

Apparently, however, unbeknownst to plaintiffs and contrary to the agreements just described, Lazard decided not to proceed with the plan contemplated in the commitment letter and instead entered into a relationship with defendant Zapco that culminated in Zapco's acquisition of the property from Crossland on terms similar to those Lazard was ostensibly negotiat-

ing on behalf of plaintiffs. Zapco's August 1995 contract to purchase the property for $55 million under the reorganization plan was based on financing provided by Lazard and Credit Lyonnais on terms similar to those proposed for plaintiffs.

According to plaintiffs, Lazard not only worked with Zapco to this end while Lazard was supposedly working on plaintiffs' behalf, but also shared with Zapco the confidential information plaintiffs had provided regarding the property's operation, thus enabling Zapco to make an offer that would be acceptable to Crossland—and one that was comparable to plaintiffs' intended offer. Plaintiffs claim that Lazard's dealings with Zapco constituted a gross violation of ethical standards applicable to investment bankers and advisors as well as a clear breach of fiduciary duty.

Plaintiffs' original complaint alleged causes of action for unjust enrichment and breach of fiduciary duty. Defendants moved to dismiss on the grounds that a defense was based on documentary evidence (CPLR 3211 [a] [1]); that plaintiffs had failed to state a cause of action (CPLR 3211 [a] [7]); and that the complaint failed to set forth in sufficient detail the alleged breach of fiduciary duty (CPLR 3016 [b]). Plaintiffs thereafter served an amended complaint, amplifying the factual allegations underlying their claims and adding the claim of unfair competition based on the misappropriation of plaintiffs' trade secrets, the building's operating data. Construing the dismissal motions as against the amended complaint at defendants' request, the court concluded that plaintiffs had failed to state a cause of action against the Lazard defendants or Zapco and dismissed the complaint. We disagree. Accepting the allegations as true and according them every favorable inference, we find that plaintiffs have sufficiently stated causes of action against the Lazard defendants for breach of fiduciary duty and for unjust enrichment as to the $300,000 application fee.

## The Unjust Enrichment Claims

A cause of action for unjust enrichment is stated where "plaintiffs have properly asserted that a benefit was bestowed * * * by plaintiffs and that defendants will obtain such benefit without adequately compensating plaintiffs therefor" (*Tarrytown House Condominiums v Hainje*, 161 AD2d 310, 313). Where defendants have reaped such benefit, equity and good conscience require that they make restitution. In dismissing the unjust enrichment claims, the court found that plaintiffs had failed to show how defendants had been enriched or that

any enrichment had been at plaintiffs' expense. According to the court, plaintiffs did no more than allege that Lazard received a benefit from them (the application fee) as well as benefits from Zapco (fees, equity interest and future profits). The court further found that the Zapco deal was not made "at plaintiffs' expense" because Crossland would never have concluded a deal with plaintiffs under any circumstances; thus, plaintiffs were never in a position to have made such a deal for themselves.

As plaintiffs correctly argue in the first instance, the court, in reaching these conclusions on motions to dismiss under CPLR 3211 (a) (1) and (7), made improper findings of fact. It is well established that, on such a motion, the pleadings must be liberally construed and the facts alleged accepted as true; the court must determine "only whether the facts as alleged fit within any cognizable legal theory" (*Leon v Martinez*, 84 NY2d 83, 87-88). So liberal is the standard under these provisions that the test is simply " 'whether the proponent of the pleading has a cause of action,' " not even " 'whether he has stated one' " (*supra*, at 88, quoting *Guggenheimer v Ginzburg*, 43 NY2d 268, 275; *see also, Campaign for Fiscal Equity v State of New York*, 86 NY2d 307, 318; *Tarrytown House Condominiums v Hainje*, *supra*).

Here, while the court determined that Crossland would never have sold the property to plaintiffs, the pleadings only refer to Crossland's unwillingness to sell to plaintiffs at the $45 million price specified in the commitment letter. According to plaintiffs' allegations, once it became clear that this price was not acceptable, Crossland continued to negotiate with plaintiffs, with Meyer now conducting the negotiations on plaintiffs' behalf. Thus, the court erred in dismissing the unjust enrichment claims on this ground.

With respect to the benefit bestowed on defendants, the receipt of a benefit alone, pursuant to the standard set forth above, is insufficient to establish a cause of action for unjust enrichment (*McGrath v Hilding*, 41 NY2d 625, 629; *Zimmerman v Pokart*, 242 AD2d 202, 204). Here, having been paid $300,000, defendants did not fulfill the terms of their agreement to work to secure a deal for plaintiffs but instead secured a deal for Zapco, using plaintiffs' confidential information. Defendants argue that, as to the $300,000 fee, plaintiffs are precluded from asserting that their payment of this fee constituted unjust enrichment when, in the commitment letter, plaintiffs specifically agreed that the fee "shall be deemed fully

earned by us [Lazard]." According to Lazard, plaintiffs thereby acknowledged that the fee had been earned—that Lazard had an absolute right to it—and therefore cannot now claim to the contrary. In making this argument, defendants insist on too literal a reading of the phrase. Indeed, the language establishes to the contrary that the fee has not actually been earned at all; it is *"deemed"* earned, i.e., it is a nonrefundable sum paid pursuant to the parties' understanding as to what Lazard *will* do on plaintiffs' behalf. Thus, plaintiffs may claim that a benefit ($300,000) was bestowed upon Lazard, for which Lazard has not adequately compensated plaintiffs (in that it abandoned its efforts on plaintiffs' behalf and secured a deal for Zapco instead). As to this benefit, the cause of action for unjust enrichment should not have been dismissed.

The remaining benefits alleged by plaintiffs, consisting of whatever flowed from the Crossland-Zapco deal to Lazard—fees paid and any equity interest or profits to be paid in the future—cannot be said to be benefits bestowed on defendants for which plaintiffs should have been compensated or to which plaintiffs were entitled. Thus, to the extent the unjust enrichment claims were based on these benefits, they were properly dismissed.

### The Breach of Fiduciary Duty Claim

■ The court dismissed the causes of action based on a breach of fiduciary duty, finding that no fiduciary relationship existed between plaintiffs and Lazard. Notwithstanding a reference to a "collective effort" by plaintiffs and Lazard to finance the recapitalization of the property, the court found that the parties had not embarked on a joint venture that might give rise to such relationship. The court further rejected the claim that Meyer had acted as plaintiffs' agent in negotiating with Crossland, thereby giving rise to a fiduciary obligation on the part of Lazard, because the complaint did not adequately set forth facts supporting the existence of an agency relationship. The court also rejected plaintiffs' claim that Lazard's relationship with plaintiffs was transformed into a fiduciary one by virtue of plaintiffs providing confidential information (the building's operational data) to Lazard.

The court correctly determined that the parties were not engaged in a joint venture. The possibility that Lazard might enjoy equity and profits from the prospective deal was insufficient for this purpose; there must also be an additional allegation that Lazard had agreed to share in any losses as well

(*Gold Mech. Contrs. v Lloyds Bank*, 197 AD2d 384; *Outrigger Constr. Co. v Bank Leumi Trust Co.*, 240 AD2d 382, 383, *lv denied* 91 NY2d 807). However, the court's determination that the relationship between plaintiffs and Lazard was "more analogous" to that of a lender-borrower and its apparent assumption that the absence of a written provision attesting to the existence of a fiduciary obligation in the context of such relationship must defeat plaintiffs' claim in this regard are incorrect.

As a general matter, an arms' length lender-borrower or creditor-debtor contractual relationship may not give rise to a fiduciary obligation on the part of the lender or creditor (*Bank Leumi Trust Co. v Block 3102 Corp.*, 180 AD2d 588, 589, *lv denied* 80 NY2d 754; *Landes v Sullivan*, 235 AD2d 657, 660; *Banque Nationale v 1567 Broadway Ownership Assocs.*, 214 AD2d 359, 360). Nor is the mere communication of confidential information sufficient in and of itself to create a fiduciary relationship between a bank and its customers. At the same time, however, it is not mandatory that a fiduciary relationship be formalized in writing, and any inquiry into whether such obligation exists is necessarily fact-specific to the particular case. Beyond what may be memorialized in writing, a court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge (*see, Chester Color Separations v Trefoil Capital Corp.*, 222 AD2d 276; *Mandelblatt v Devon Stores,* 132 AD2d 162, 167-168; *Manufacturers Hanover Trust Co. v Yanakas*, 7 F3d 310, 318 [2d Cir 1993], *motion for vacatur denied* 11 F3d 381). Thus, the ongoing conduct between parties may give rise to a fiduciary relationship that will be recognized by the courts (*see, e.g., Kern v Currie Assocs.*, 220 AD2d 255). This is precisely what plaintiffs alleged occurred here.

While in some instances courts have declined to find the existence of a fiduciary relationship where the parties failed to provide for it in their written agreements, the agreements in those cases were far more extensive or comprehensive than the contract between the parties before us (*see, e.g., Northeast Gen. Corp. v Wellington Adv.*, 82 NY2d 158; *Trump v Corcoran Group*, 240 AD2d 159). Even in those cases, however, the court carefully considered the ongoing conduct between the parties outside of the written contract before reaching its conclusion.

With respect to the court's finding that plaintiffs failed to establish Meyer's status as plaintiffs' agent in his negotiations with Crossland, in that the pleadings did not set forth suf-

ficient facts to support the existence of an agency relationship, we find to the contrary that the pleadings were sufficiently detailed to apprise defendants of the conduct on which this claim was predicated, in satisfaction of CPLR 3016 (b). In determining whether pleadings meet the statutory requirement, we have "subordinated the threshold pleading requirement of CPLR 3016 (subd [b]) to the notice standard of CPLR 3013" (*Ackerman v Vertical Club Corp.*, 94 AD2d 665, 666, *appeal dismissed* 60 NY2d 644). Here, plaintiffs alleged that Meyer had acted on their behalf in assuming negotiations with Crossland, and that they had relied upon him specifically because of Lazard's expertise and reputation, because of Meyer's alleged "inside connection" with a highly placed Crossland executive and because Crossland apparently preferred to deal with plaintiffs through Lazard rather than directly with plaintiffs. Accordingly, for all of the foregoing reasons, the claim for breach of fiduciary obligation should not have been dismissed against Lazard.

## The Unfair Competition Claim

■ Plaintiffs maintain that the information pertaining to the operation of the building constituted "trade secrets" improperly disclosed by Lazard to Zapco for the express purpose of enabling Zapco to make an attractive offer to Crossland that would be comparable to plaintiffs' offer, thereby depriving plaintiffs of the opportunity to buy back the property. As previously explained, plaintiffs' contention is that only a party with knowledge of this data would make an offer sufficiently high to be accepted by Crossland.

While it is true that plaintiffs' possession of this data placed them in an advantageous position in dealing with Crossland, and that the possession of the data by another party would deprive plaintiffs of this advantage, the data did not thereby acquire "trade secret" status such that it was entitled to trade secret protection. The motion court properly determined that the information was simply not the type entitled to such protection and correctly dismissed the unfair competition claims that were predicated on according the data such status.

According to the Restatement of Torts (§ 757, comment *b*), a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Restatement (Third) of Unfair Competition § 39 defines a trade secret as "any information

that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others." The following factors may be considered in determining whether information qualifies as a trade secret: "(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." (Restatement of Torts § 757, comment *b*.)

As the Court of Appeals has observed, the information must, in the first instance, be secret (*Ashland Mgt. v Janien*, 82 NY2d 395, 407). Here, the data relating to the building's operations, and even the data relating to negotiations with tenants and unions, cannot be considered to be of a genuinely "secret" nature. While the data might not have been known generally to the public or to others in the business, it could have been acquired. Indeed, except for the advantage plaintiffs perceived in exclusive possession of such data, the information would not likely have been considered secret, and there are no factual allegations suggesting that, prior to negotiations with Crossland, measures were taken to treat it as such. The mere fact that it suited plaintiffs that the information be kept from other bidders does not confer trade secret status upon the information. Similarly, the reports produced as a result of the audits (conducted pursuant to the terms of the commitment letter) may have been considered confidential, but they too fail to qualify as trade secrets when measured against the factors listed above.

### The Claims Against Zapco

Zapco maintains that, pursuant to the provisions of the confirmation order in 1500 Realty's reorganization and Bankruptcy Code (11 USC) § 1141, plaintiffs' claims against it are precluded as a matter of law, because the property was to be transferred free of all claims or adverse interests. While plaintiffs did not directly ask the court to set aside Crossland's transfer of the property to Zapco, the effective result of their claims against Zapco would be to impair their title and nullify the confirmation order (*see, e.g., Southmark Props. v Charles*

*House Corp.*, 742 F2d 862 [5th Cir 1984]), and thus they were properly dismissed. In addition, we note that plaintiffs failed to make all but the most conclusory allegations against Zapco in terms of having aided and abetted Lazard, and for this reason as well the claims against Zapco were properly dismissed (*see, First Nationwide Bank v 965 Amsterdam*, 212 AD2d 469, 472).

Accordingly, the judgment of the Supreme Court, New York County (Beatrice Shainswit, J.), entered September 20, 1996, which, insofar as appealed from, dismissed the amended complaint against defendants Lazard Freres & Co., Lazard Freres Real Estate Investors Corp., Lazard Freres Real Estate Fund, L.P., and Zapco 1500 Investment, L.P., should be modified, on the law, to the extent of reinstating the claims only as against the Lazard defendants for breach of fiduciary duty and for unjust enrichment as to the application fee paid by plaintiffs, and otherwise affirmed, without costs. The appeal from the order of the same court and Justice, entered September 13, 1996, should be dismissed, without costs, as subsumed in the appeal from the judgment.

ELLERIN, WILLIAMS and ANDRIAS, JJ., concur.

Judgment, Supreme Court, New York County, entered September 20, 1996, modified, on the law, to the extent of reinstating the claims only as against the Lazard defendants for breach of fiduciary duty and for unjust enrichment as to the application fee paid by plaintiffs, and otherwise affirmed, without costs, and appeal from order, same court and Justice, entered September 13, 1996, dismissed, without costs, as subsumed in the appeal from the judgment.